IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KRISTINA SHAVER
On behalf of herself and others
similarly situated,

    *Plaintiff*,

    v.                                                                          Civil Action No. ELH-14-3977

GILLS ELDERSBURG, INC.,
GILLS WESTMINSTER, INC., and
GURDIP GILL

    *Defendants*.

**MEMORANDUM OPINION**

In December 2014, plaintiff Kristina Shaver filed a wage and hour action, on behalf of herself and others similarly situated, against her former employers, defendants Gills Eldersburg, Inc.; Gills Westminster, Inc.; and Gurdip Gill. ECF 1. Mr. Gill is the owner and president of Gills Eldersburg, Inc. ("Denny's Eldersburg") and Gills Westminster, Inc. ("Denny's Westminster"). Denny's Eldersburg is a Maryland corporation that operates a Denny's franchise restaurant in Eldersburg, Maryland ("Eldersburg Location"). *Id. ¶* 2. Denny's Westminster is a Maryland corporation that operates a Denny's franchise restaurant in Westminster, Maryland ("Westminster Location"). *Id. ¶* 4.

In an Amended Complaint filed July 23, 2015 (ECF 39), plaintiff added WDPB, Inc. ("WDPB") and Patrick Hess as defendants.[1] WDPB is a Maryland corporation owned by Hess. *Id. ¶¶* 6, 7. WDPB and Hess owned both Denny's restaurants until on or about January 17, 2013.

---

[1] The Amended Complaint names Shaver as the only plaintiff. However, as of May 5, 2015, both Ryan Lane and Marisa Furr had filed consents to join as plaintiffs. *See* ECF 24; ECF 25.

*Id.* ¶¶ 13, 14, 17, 18.  At that time, they sold the restaurants to defendants.  *Id.* ¶¶ 14, 18.[2] However, plaintiff alleges that Hess and WDPB were actively engaged in the management and operation of both Denny's restaurants until June 2013, when Gill, Denny's Westminster, and Denny's Eldersburg assumed operational control.  *Id.* ¶¶ 15, 16, 19, 20.

The dispute arises from alleged unpaid wages earned by plaintiff and other hourly workers during their employment by defendants.  Shaver began working at the Eldersburg Location in May 2008.  ECF 39 ¶ 25.  She worked at the Westminster Location from June 2014 until August 2014.  *Id.* ¶ 26.  In particular, the Amended Complaint alleges that defendants violated the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"); the Maryland Wage and Hour Law, Md. Code (2013 Repl. Vol.), Labor and Employment Article ("L.E.") § 3-401 *et seq.*; and the Maryland Wage Payment and Collection Law, L.E. § 3-501 *et seq.*

On May 4, 2015, Shaver filed a "Motion for Collective Certification and to Facilitate Collective Action Notice under 29 U.S.C. §216(b)."  *See* ECF 22 ("Motion to Certify the Collective" or "Motion").[3]  The Motion is supported by a memorandum of law (ECF 22-1, "Shaver Memo.") and ten exhibits.[4]  *See* ECF 22-2 through ECF 22-11.  In the Motion, plaintiff

---

[2] On September 1, 2015, WDPB and Hess moved to dismiss the Amended Complaint. ECF 48.  The motion to dismiss has not yet been fully briefed and is not addressed in this Memorandum Opinion.

[3] The Motion to Certify the Collective was filed only by Shaver.  But, after the Motion was fully briefed, Marisa Furr and Ryan Lane joined the suit as "Party Plaintiffs," by filing a "Consent to Sue."  ECF 24; ECF 25.  The Motion was filed before Hess and WDPB were added as defendants.

[4] These exhibits include declarations from Ms. Shaver (ECF 22-3); Ryan Lane (ECF 22-4); and Marisa Furr (ECF 22-5).  Also attached are certain "Preliminary Pull Reports and Clock-

seeks to certify a "proposed collective" pursuant to 29 U.S.C. § 216(b),[5] to include the following, ECF 22-1 at 1 (emphasis in Shaver Memo.):

> **Each current and former hourly paid employee who worked/works at Denny's Restaurant at 6400 Ridge Road, Eldersburg, MD 21784 and/or Denny's Restaurant at 400 Englar Road, Westminster, MD 21157 from any time between December 2011 and present.**

In the Motion, plaintiff also asked the Court to approve a proposed "Notice of Collective Action and Opt-In consent Form" (ECF 22-2, "Proposed Notice"), to be sent to the potential opt-in plaintiffs in the event the collective action is certified. *See* ECF 22-1 at 15, Shaver Memo. Notably, the Motion was filed before plaintiff filed her Amended Complaint, adding WDPB and Hess as defendants. After the Amended Complaint was filed, plaintiff did not revise her Motion.

Defendants Gill, Denny's Eldersburg, and Denny's Westminster (collectively, "Gill Defendants" or "Opposing Defendants") oppose the Motion (ECF 28, "Opposition"), and submitted three exhibits.[6] Shaver replied (ECF 33, "Reply") and submitted three exhibits.[7] Hess and WDPB did not respond to the Motion. Therefore, I do not include them when referring to "Opposing Defendants" or the "Gill Defendants."

---

Out Slips" for Ms. Shaver. *See* ECF 22-6 through ECF 22-10. Ms. Shaver contends that these reports and slips document the time that she worked at the Westminster Location during the week of July 31, 2014. ECF 22-1 at 2, Shaver Memo.

[5] To be clear, this Motion does not request class certification under Fed. R. Civ. P. 23.

[6] The three exhibits were submitted together as ECF 28-1 ("Defense Exhibits"). The Defense Exhibits include: (1) a Declaration from David Hashim, ECF 28-1 at 1-4; (2) "Articles of Incorporation for a Stock Corporation" for the Westminster Location and the Eldersburg Location, *id.* at 5-8; and (3) "Sign Off Reports" that Opposing Defendants contend document the time Shaver worked at the Westminster Location during the disputed week of July 31, 2014. *Id.* at 9-10.

[7] One exhibit includes several "Preliminary Server Pull Reports," which purport to document the hours that Shaver worked at the Westminster Location on August 2, 2014. *See*

On October 2, 2015, I conducted a telephone conference with counsel and, during the conference, plaintiff's counsel represented that plaintiff would revise her certification request to date from October 2012, rather than from December 2011.  Thereafter, by letter of October 2, 2015 (ECF 57), plaintiff again revised her request, stating that she seeks conditional certification as of January 18, 2013, *i.e.*, one day after the restaurants were sold by Hess and WDPB to the Gill Defendants.

The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion in part and deny it in part (ECF 22); I will conditionally certify the collective as of January 18, 2013.

## I.  FACTUAL BACKGROUND[8]

Hess and WDPB owned the Westminster Location and the Eldersburg Location  until January 2013.[9]  ECF 39 ¶ 13, Amended Complaint. On January 17, 2013, Hess and WDPB sold the Westminster Location to Mr. Gill and Westminster.  Also on January 17, 2013, Hess and WDPB sold the Denny's Eldersburg Location to Mr. Gill and Eldersburg.  *Id.* ¶ 18.  However, Mr. Gill and Denny's Westminster did not "assume[ ] operational control" of the Westminster Location until June 6, 2013.  *Id.*   ¶ 15.   And, Mr. Gill and Eldersburg did not assume "operational control" of Denny's Eldersburg until June 6, 2013.  *Id.* ¶ 19.

According to the Amended Complaint, Hess remained "actively involved" in the

---

ECF 33-1.  Another exhibit shows "Sign Off Reports" that correspond to the date in question. ECF 33-2.  The final exhibit is a "Supplemental Declaration of Kristina Shaver," explaining the significance of these exhibits.  ECF 33-3.

[8] The facts are drawn largely from the Amended Complaint and the exhibits.

[9] The Amended Complaint does not indicate when Hess and WDPB first acquired the Westminster Location or the Eldersburg Location.

management and operation of both the Eldersburg Location and the Westminster Location until June 6, 2013. *Id.* ¶¶ 16, 20. This included "the management and direction of . . . employees, including those employees who set the pay rate and hours [of pay] of the Plaintiff (and those similarly situated) . . . ." *Id.* ¶¶ 16, 20.

As noted, Shaver worked as a server at the Eldersburg Location, on an hourly basis, from May 2008 to June 2014. ECF 39 ¶ 25, Amended Complaint; ECF 22-3, Declaration of Kristina Shaver dated 5/1/15 ("Shaver Declaration"), ¶ 2. She worked as a server at the Westminster Location from June 2014 to August 2014. ECF 39 ¶ 26; ECF 22-3 ¶¶ 3, 4. Both restaurants operate 24 hours a day, seven days a week. Declaration of David Hashim, ECF 28-1 ¶ 13 ("Hashim Declaration"). The work day is a period of 24 hours, beginning at 7:00 a.m. *Id.* ¶ 14.

Plaintiff, and other employees "similarly situated," were paid by the hour (ECF 39 ¶ 27, Amended Complaint), and "regularly worked for Defendants for more than forty (40) hours per week." *Id.* ¶ 28. According to the Amended Complaint, Shaver's hourly rate was "$3.63 per hour plus tips." *Id.* ¶ 29. Plaintiff asserts: "Defendants altered Plaintiff's time records per week and failed to pay her minimum wage and overtime premium." *Id.* ¶ 30.

In support of plaintiff's Motion, plaintiff relies on her own Declaration, as well as declarations of two former co-workers. *See* ECF 22-3, Shaver Declaration; ECF 22-4, Declaration of Ryan Lane dated 5/2/15 (ECF 22-4, "Lane Declaration"); and ECF 22-5, Declaration of Marisa Furr dated 5/1/15 ("Furr Declaration"). Plaintiff insists that the declarations and time sheets "illustrate Defendants' commonly applied policy and practice of failing to pay their hard-working hourly-paid employees minimum wage as well as proper overtime compensation for hours worked in excess of forty (40) hours in a given week." ECF

22-1 at 2, Shaver Memo.

In the Shaver Declaration, plaintiff asserts that, during the course of her employment, she "was required to work off the clock." *Id.* ¶ 6, She also claims: "Defendants required [her] to clock out of [her] shift and continue to work without pay on a daily basis." *Id.* at ¶ 7. According to Shaver, she was "never paid for the work [ ] performed off the clock." *Id.* ¶ 9. Shaver adds: "Denny's Eldersburg and Denny's Westminster have employed at least forty (40) other hourly paid employees who were/are subjected to Defendants' wage policy and practice described above." *Id.* ¶ 14.

Marisa Furr, an employee of Denny's Eldersburg from August 2012 through July 2012 and August 2013 through October 2013, paints a similar picture.   ECF 22-5 ¶ 2, Furr Declaration.  Although Furr does not specify the capacity in which she worked for defendants, she avers that she was an hourly employee.  *Id.*  Furr also explains that, during her employment, "[her] punch-in and punch-out times were adjusted by someone other than [herself] to reflect less time than [what she] actually worked.  *Id.* ¶ 8.  Likewise, she claims she was "never paid for the work [she] performed off the clock."  *Id.* ¶ 7.

Ryan Lane, another former employee of Denny's Eldersburg and Denny's Westminster, offered a similar account of events during the course of his employment.   ECF 22-4, Lane Declaration.   He claims he was employed as a server at the Eldersburg Location from 2009 through 2011.  *Id.* ¶ 2.  From October 2013 through January 2014, he worked as a server at the Westminster Location, and was then promoted to assistant manager.  *Id.*  Lane held that position until May 2014.  *Id.*  Lane claims that, during his employment, "Defendants required [him] to clock out of [his] shift and continue to work without pay on a daily basis."  *Id.* ¶ 5.  Because of

the manipulation of his hours, Lane insists that he "did not receive [his] proper compensation." *Id.* ¶ 10.

According to Lane, he was promoted to an assistant manager in January 2014. ECF 22-4 ¶ 2, Lane Declaration. At that time, a manager named "'Kelly,'" superior to him, "instructed" him to "to adjust and reduce workers' hours in order to meet the restaurant's labor to sales ratio." *Id.* ¶ 12, Lane Declaration.[10] Lane asserts that "[t]ime altering and reducing was done to the hourly employees every week," *id.* ¶ 14, "to reduce the restaurant's labor costs, thereby meeting [the] labor to sales ratio requirement." *Id.* ¶ 15.

According to the declarations of Shaver and Lane, both worked for Hess and WDPB, as well as the Gill Defendants. But, neither Lane nor Shaver proffers any specific facts as to the management practices of Hess or WDPB, presumably because they had not yet been named as defendants when the declarations were filed. In other words, when the Motion to Certify the Collective was filed on May 4, 2015, the reference to "defendants" in the declarations would have pertained only to Mr. Gill, Denny's Eldersburg, and Denny's Westminster, because Hess and WDPB were not named as defendants until the Amended Complaint was filed on July 23, 2015. *See* ECF 22-3, Shaver Declaration ("Defendants required me to clock out of my shift and continue to work without pay. . . ."); ECF 22-5 ¶ 4, Furr Declaration ("During my course of employment with Defendants I was required to work off the clock."); ECF 22-4 ¶¶ 2, 4, 8 (explaining that he worked as an hourly paid server from 2009-2011 but only describing management practices "[d]uring [the] course of [his] employment with Defendants" and time manipulation at the hands of "Defendant's managers" ).

--------

[10] Opposing Defendants assert that Kelly Ammenheuser "is the only management level employee named 'Kelly' employed by either company." ECF 28 at 3, Opposition.

To illustrate a particular instance when Opposing Defendants allegedly engaged in time manipulation, Shaver submitted materials purportedly documenting the hours she worked and hours for which she was paid during the week of July 31, 2014. Shaver explains that the clock-out slips and pull reports, when compared to the payroll sheet, establish the hours for which she was not paid. Shaver insists the discrepancy in hours clocked in and the hours actually paid, as listed in the payroll report, evidences that plaintiff was not paid in full for all the hours that she worked.

Turning to the particular records relied on by plaintiff, a preliminary pull report for July 31, 2014, indicates that Shaver clocked into work at 5:59 A.M., and a clock out slip for that same date shows plaintiff clocked out at 3:00 P.M. ECF 22-6 at 1-2. It lists Shaver's "regular hours" for July 31, 2014 as 6.45 hours. *Id.* at 2. Yet, the Payroll Detail Report (ECF 22-11 at 2) for that week shows that Shaver was only paid for a total of 2.42 hours of work on July 31, 2014.

The remaining time records submitted by plaintiff for the period of August 1, 2014 to August 4, 2014, appear to reflect a similar inconsistency. The preliminary pull report for August 1, 2014, indicates that Shaver clocked in at 6:29 A.M. ECF 22-7 at 2. And, her clock out slip for that same date suggests she clocked out at 2:03 P.M. *Id.* at 3. These hours suggest that plaintiff was at work for a total of seven hours and thirty-four minutes on August 1, 2014. The same clock out slip that shows plaintiff clocked out at 2:03 P.M. states that her "regular hours" were limited to 6.37 hours. *Id.* at 3. But, the week's Payroll Detail Report shows plaintiff was paid for 6.82 hours that day. ECF 22-11 at 2, Payroll Detail Report.

The preliminary pull report for August 2, 2014, indicates that Shaver clocked in at 6:33 A.M., and the clock out slip for the same date indicates that she clocked out at 2:54 P.M. ECF

22-8 at 2-3.  This suggests that Shaver was at work a total of eight hours and twenty-one minutes on that day.  ECF 22-8 at 3.  But, the clock out slip lists Shaver's "regular hours" for the day as 7.23 hours.  *Id.*  Despite what is listed on the clock out slip, the week's Payroll Detail Report shows plaintiff was paid for 5.35 hours that day.  ECF 22-11 at 2, Payroll Detail Report.

The preliminary pull report for August 3, 2014, indicates that Shaver clocked in at 6:04 A.M., and the clock out slip states she clocked out at 3:07 P.M.  ECF 22-9 at 2-3.   These time records suggest that plaintiff was at work for nine hours and thirty-three minutes.  But, the clock out slip states that Shaver worked 8.02 "regular hours" that day.  *Id.* at 3.  The week's payroll report shows plaintiff was paid for 8.14 hours that day.  ECF 22-11 at 2, Payroll Detail Report.

The preliminary pull report for August 4, 2014, indicates that Shaver clocked in at 6:53 A.M. and the clock out report for the same date reflects that she clocked out at 2:28 P.M.  ECF 22-10 at 2-3.  These time records seem to suggest plaintiff was at work for at least seven hours and thirty-one minutes.  *Id.* at 3.  According to the week's payroll report, she was paid for 5.98 hours of work that day.  ECF 22-11 at 2, Payroll Detail Report.

Opposing Defendants maintain that "the documents do not demonstrate on their face, as Plaintiff asserts, either the hours actually worked by Plaintiff on those days or that any hours recorded by Defendants' timekeeping system were reduced for improper reasons."  ECF 28 at 5, Opposition.  They rely, *inter alia*, on the Declaration of David Hashim, ECF 28-1.  Hashim, Director of Operations, "oversee[s] the restaurant operations" of Denny's Eldersburg and Denny's Westminster.  ECF 28-1 ¶ 1, Hashim Declaration.  He asserts:  "The preliminary server pull report which Plaintiff has attached to her motion as Exhibit 22-6, page 2 is not a time keeping record, but shows the date and time that a cash register drawer was assigned to a server.

Cash registers are assigned to servers by a manager and this may be done prior to the beginning of a shift and prior to the arrival of a server to the job site." *Id.* ¶ 18.

As explained by Hashim, employee timekeeping at the Eldersburg Location and at the Westminster Location was facilitated through the "Dine System." ECF 28-1 ¶ 19. He describes the system as follows: "[The Eldersburg Location] and [the Westminster Location] use a point of sale system called the Dine System to record employee hours. Employees clock in through the Dine System by using an access card or by entering their ID number. A server must be clocked in through the Dine System to be able to enter a customer order or to issue a check to a table." *Id.* ¶ 16. He adds, *id.* ¶ 19:

> Changes to an employee's timekeeping record may be made by management through the Dine System to correct timekeeping errors. For example, if an employee fails to clock in, the timekeeping record may be changed to credit the employee for time on the job that was not otherwise recorded. Or, if an employee fails to clock out for a break or when he or she departs the restaurant, the recorded time can be reduced to correspond to the actual hours worked.

Hashim also explains, *id.* ¶ 20: "The Dine System records timekeeping changes made by a manager and the changes are reflected on a document called a Sign Off Report. A Sign Off Report shows the final time worked by each employee after any correction and is submitted to payroll for processing an employee's pay check."

Notably, nothing in the Hashim Declaration indicates that servers are subject to different timekeeping policies than non-server hourly employees. To the contrary, Hashim's description of the Dine System suggests that it is used to record the time of all hourly employees.

Additional facts are included in the Discussion.

## II. DISCUSSION

### A.  Conditional Certification under FLSA

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)) (alterations in *Barrentine*).  In particular, the statute "establishe[s] a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek . . . ."  *Perez v. Mortgage Bankers Ass'n*, ____ U.S. ____, 135 S. Ct. 1199, 1204 (2015) (quotations omitted) (alterations in *Perez*); *see Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. ___, 135 S.Ct. 513, 516 (2014).

The FLSA also established the "general rule that employers must compensate each employee 'at a rate not less than one and one-half times the regular rate' for all overtime hours that an employee works." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337 (4th Cir. 2008) (quoting 29 U.S.C. § 207(a)(1)).  Thus, the FLSA is now "best understood as the 'minimum wage/maximum hour law." *Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 446 (4th Cir. 2015) (citation omitted); *see also Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1266-67 (4th Cir. 1996) ("The two central themes of the FLSA are its minimum wage and overtime requirements . . . . The FLSA is clearly structured to provide workers with specific minimum protections against excessive work hours and substandard wages.") (internal quotations omitted).

"Under the FLSA, plaintiffs may maintain a collective action against their employer for

violations under the act pursuant to 29 U.S.C. § 216(b)." *Quinteros v. Sparkle Cleaning, Inc.*,

532 F. Supp. 2d 762. 771 (D. Md. 2008).  Section 216(b) states, in pertinent part:

> An action . . . may be maintained against any employer . . . in any Federal or
> State court of competent jurisdiction by any one or more employees for and in
> behalf of himself or themselves and other employees similarly situated. No
> employee shall be a party plaintiff to any such action unless he gives his consent
> in writing to become such a party and such consent is filed in the court in which
> such action is brought.

Pursuant to § 216(b), "[d]eterminations of the appropriateness of conditional collective

action certification and court-facilitated notice are left to the court's discretion." *Syrja v. Westat,

Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010).  But, generally, when assessing whether to certify

a collective action pursuant to FLSA, district courts in this circuit adhere to a two-stage process.

*See, e.g.*, *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 566 (D. Md. 2012); *see also

Flores v. Unity Disposal & Recycling, LLC*, GJH-15-196, 2015 WL 1523018, at *2-*3 (D. Md.

Apr. 2, 2015); *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007)

"In the first stage, commonly referred to as the notice stage, the court makes a threshold

determination of whether the plaintiffs have demonstrated that potential class members are

similarly situated, such that court-facilitated notice to putative class members would be

appropriate." *Butler*, *supra*, 876 F. Supp. 2d at 566 (internal quotations omitted).  "In the second

stage, following the conclusion of discovery, the court engages in a more stringent inquiry to

determine whether the plaintiff class is [in fact] similarly situated in accordance with the

requirements of § 216, and renders a final decision regarding the propriety of proceeding as a

collective action." *Syria*, 756 F. Supp. 2d at 686 (internal quotations and citations omitted)

(alterations in *Syria*).

The Motion pertains only to the first step of conditional certification.  At the first stage, to warrant conditional certification, a plaintiff need only show that collective members are "similarly situated" within the meaning of 29 U.S.C. § 216(b).  *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000).  "'[S]imilarly situated' need not mean 'identical.'" *Bouthner v. Cleveland Const., Inc.*, RDB-11-0244, 2012 WL 738578, at *4 (D. Md. Mar. 5, 2012).  Rather, similarly situated means a plaintiff was the victim of a "common policy, scheme, or plan that violated the law."  *Butler*, 876 F. Supp. 2d at 566 (citing *Mancia v. Mayflower Textile Servs. Co.*, CCB-08-0273, 2008 WL 4735344, at *3 (D. Md. Oct. 14, 2008)); *see also Houston v. URS Corp.*, 591 F. Supp. 2d 827, 831-32 (E.D. Va. 2008).

In general, a plaintiff need only make a "relatively modest factual showing" that such a common policy, scheme, or plan exists.  *Marroquin v. Canales,* 236 F.R.D. 257, 259 (D. Md. 2006).  To make this showing, "[p]laintiffs may rely on '[a]ffidavits or other means,' such as declarations and deposition testimony."  *Butler*, 876 F. Supp. 2d at 567 (quoting *Williams v. Long*, 585 F. Supp. 2d 679, 684-85 (D. Md. 2008)) (alterations in *Butler*).  Based on the submissions, the court "determines whether there is sufficient evidence to reasonably determine that the proposed class members are similarly situated enough to conditionally certify the collective action and provide potential class members with initial notice of the action and the opportunity to 'opt-in.'"  *Houston*, 591 F. Supp. at 831.

As noted, plaintiff seeks to certify a collective that includes all "**former hourly paid employee[s]**" who worked at the Westminster Location and the Eldersburg Location.  ECF 22-1 at 1, Shaver Memo. (emphasis in Shaver Memo.).  Initially, Shaver sought certification as of December 2011 to present.  *Id.*  Since then, plaintiff has revised her request, seeking certification

from January 18, 2013 (ECF 57), corresponding to the date when the Gill Defendants acquired both restaurants.

The Gill Defendants challenge conditional collective certification, claiming there is a "lack of specific evidence showing a common scheme or policy spanning the restaurants and years at issue . . . ."  ECF 28 at 7, Opposition.  In their view, the evidence does not show a policy; it shows "independent, isolated acts. . . ."  ECF 28 at 2, Opposition.  *See also id.* at 6-7. In other words, Opposing Defendants assert that the plaintiff has not met her burden.   In particular, the Gill Defendants challenge the reliance on preliminary pull records.    And, they insist that the declarations and documents that plaintiff produced "offer few specifics" to demonstrate that "hourly employees were subjected to a common policy or scheme rather than the independent actions of a wayward manager."  *Id*. at 6.

Opposing Defendants' insistence that the preliminary pull reports do not support the existence of a FLSA violation bears little relation to whether the proposed members of the collective action are similarly situated.  "Courts do not require proof of an actual FLSA violation [at this stage], but rather that a factual nexus exists between the plaintiff's situation and the situation of other potential plaintiffs."  *Velasquez v. Digital Page, Inc.*, 11-3892 LDW AKT, 2014 WL 2048425, at *8 (E.D.N.Y. May 19, 2014) (internal quotations omitted).

Moreover, Opposing Defendants' doubt as to the significance of the preliminary pull reports does not overcome the showing already made by plaintiff.  There is no question that the two opt-in plaintiffs attest in their declarations that they were hourly employees who were allegedly subjected to the withholding or manipulation of wages.  One of them, Lane, was an assistant manager.  In addition, plaintiff has submitted her own Declaration, to the same effect.

In addition, there are no significant individualized questions of law or fact that warrant denial of conditional certification at this time.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170-71 (1989) (observing that the primary objective of a collective action under the FLSA is to serve judicial interests through resolution of a single proceeding of claims rooted in common issues of law and fact).

Given the modest burden imposed on plaintiff at this preliminary stage, the arguments advanced by the Gill Defendants are not persuasive.  Conditional certification of a collective action appears appropriate.

In the alternative, Opposing Defendants insist that, even if the Court determines that conditional certification is appropriate, the proposed collective is too broadly defined.  In particular, they take exception to the inclusion of non-servers in plaintiffs' proposed collective. Opposing Defendants seem to suggest that somehow servers are not similarly situated to other hourly employees.  According to Opposing Defendants, limiting the potential opt-in plaintiffs to servers is necessary because "[p]laintiff has not identified any non-server employee allegedly impacted by time shaving or off clock work at either restaurant location."  ECF 28 at 8, Opposition Memo.

The defense's assertion is wholly unsubstantiated and contrary to the evidence submitted by Shaver.  The Gill Defendants offer no explanation of how servers were treated differently than other hourly employees.  They do not allege that non-server employees utilized a different timekeeping system or were subject to different management policies and practices than servers. Indeed, the Hashim Declaration, upon which the Opposing Defendants rely, supports the opposite notion—that all hourly employees utilized the Dine System and that time entries were

adjusted by restaurant management, if necessary, to correct errors.

In particular, Hashim described the Dine System as the program used to "record *employee* hours," not just server hours.  ECF 28-1 ¶ 16 (emphasis added).  In addition, Hashim explained that "*[e]mployees* clock in through the Dine System " *id.* (emphasis added), and that "[c]hanges to an *employee's* timekeeping record may be made by management through the Dine System to correct timekeeping errors." *Id.* ¶ 19 (emphasis added).  In this respect, Hashim did not distinguish between servers and other hourly employees.

The Lane Declaration echoes this point.  According to Lane, as assistant manager he was instructed "to adjust and reduce *workers' hours* in order to meet the restaurant's labor to sales ratio."  ECF 22-4 ¶ 12, Lane Declaration.  Further, Lane asserted that "[t]ime altering and reducing *was done to the hourly employees* every week." *Id.* ¶ 14 (emphasis added).  Lane did not suggest that such practices were directed exclusively to servers.  Rather, according to Lane, the purported time manipulation scheme appeared to target all hourly employees.

As indicated, plaintiff's chief contention appears to be that Opposing Defendants manipulated the timekeeping system and directed hourly employees to clock out prior to completing their work.  It is reasonable to conclude that all hourly employees were subject to a common timekeeping practice or policy during the period in question, as no evidence to the contrary was presented.

In addition, plaintiff argues that the issue of narrowing the collective to include only servers is more appropriately left to the second stage of the certification process.  ECF 33 at 15, Reply.  She points out that Opposing Defendants will have a second opportunity to limit the collective in the "decertification" stage. *Id.* 15-16.  Plaintiff's point is well taken.

At the initial stage, "situations [of the plaintiffs] need not be identical." *De Luna-Guerrero v. N.C. Grower's Ass'n, Inc.*, 338 F.Supp.2d 649, 654 (E.D.N.C. 2004) (quotations omitted). Indeed, case law suggests that opt-in plaintiffs need not necessarily occupy the same position as the initial plaintiff. *See, e.g.*, *Flores*, *supra*, 2015 WL 1523018 at *4 (granting conditional certification when "Plaintiffs' declarations suggest that [the] flat-rate payment policy [that violated the FLSA] was not just limited to Plaintiff [ ], but was, instead, a company-wide practice that affected all helpers and drivers employed by [defendant] as sanitation workers."). A plaintiff must only present "a similar legal issue as to coverage, exemption, or nonpayment o[f] minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions . . . ." *De Luna-Guerrero*, 338 F.Supp.2d at 654 (quotations omitted).

As such, I reject Opposing Defendants' challenge to the inclusion of non-server hourly employees, without prejudice to their right in the second phase of conditional collective certification to contest whether all opt-in plaintiffs are sufficiently similarly situated. As Judge Messitte has explained, "[i]n the second stage, following the conclusion of discovery, 'the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action.'" *Syrja*, *supra*, 756 F. Supp. 2d at 686 (quoting *Rawls*, *supra*, 244 F.R.D. at 300).

Although Opposing Defendants owned the restaurants as of January 2013, they also seek to restrict the collective to employees at Eldersburg and Westminster after the date of June 6, 2013, when Opposing Defendants allegedly began to operate the franchises acquired from

WDPB and Hess.  ECF 28 at 2, 8, Opposition.  They argue that limiting the collective to include only employees who worked under their management is appropriate because they should not be held responsible for purported FLSA violations that occurred prior to their operation of the franchises.  Opposing Defendants also note: "The prior owner [of the franchise in question], WDPB, Inc., is not currently a party to this action.  Defendants reserve the right to implead WDPB, Inc. should the Court grant Plaintiff's motion for conditional certification."  ECF 28 at 2, n.1, Opposition Motion.

The Gill Defendants have not set forth any meritorious ground to support the argument that there is no basis for certification for the entire period of their ownership.  Moreover, Hess and WDPB have since been added as defendants.  Therefore, plaintiff is no longer seeking to hold Opposing Defendants exclusively responsible for events that allegedly preceded their operation of the Denny's  franchises.

The evidence presented by plaintiff is sufficient to satisfy the minimal evidentiary burden as to the existence of a common practice or policy that violated the FLSA.  Accordingly, conditional certification of this action is appropriate, pursuant to 29 U.S.C. § 216(b), as to all hourly employees of Denny's Eldersburg and Denny's Westminster, dating from January 18, 2013, to the present.  This conclusion is in line with numerous cases that have conditionally certified collective actions based on analogous circumstances. *See, e.g.*, *Essame v. SSC Laurel Operating Co. LLC*, 847 F. Supp. 2d 821, 825-28 (D. Md. 2012); *Faust v. Comcast Cable Commc'ns Mgmt.*, *LLC*, WMN-10-2336, 2011 WL 5244421, at *5 (D. Md. Nov. 1, 2011) (finding that the plaintiffs had made the "modest factual showing" necessary to warrant conditional certification regarding an unlawful compensation policy by submitting evidence that

they were "encouraged to work off the clock, [were] in fact working of the clock with their supervisor's knowledge, and [were] not being properly compensated for that time"); *Espenscheid v. DirecStat USA, LLC*, 09-CV-625-BBC, 2010 WL 2330309, at *7-8 (W.D. Wis. June 7, 2010) (conditionally certifying a collective when the plaintiffs submitted affidavits from several putative class members supporting that the defendants did not compensate them for overtime involving pre- and post-shift work and affidavits from managers acknowledging this practice existed).

### B.  Form and Manner of Court-Facilitated Notice

Along with the Motion, plaintiff filed a Proposed Notice.  ECF 22-2.  Plaintiff seeks Court approval of the Proposed Notice as well as the Court's authorization to issue the Proposed Notice to prospective plaintiffs.  Opposing Defendants request certain modifications to the Proposed Notice.

"Neither the FLSA, nor other courts, have specifically outlined what form court[ ]authorized notice should take nor what provisions the notice should contain."  *Velasquez*, 2014 WL 2048425, at *9 (quotations and certain brackets omitted).  Indeed, the Supreme Court has abstained from reviewing the contents of a proposed notice pursuant to § 216(b), observing: "[W]e decline to examine the terms of the notice . . . .  We confirm the existence of the trial court's discretion, not the details of its exercise."  *Hoffman-La Roche Inc.*, *supra*, 493 U.S. at 170.

"'The overarching policies of the FLSA's collective suit provisions [29 U.S.C. § 216(b)] require that the proposed notice provide "accurate and timely notice concerning the pendency of the collective action, so that [potential plaintiffs] can make informed decisions about whether to

participate.'"'" *Butler*, *supra*, 876 F. Supp. 2d at 574-75 (alternations in *Butler*) (citations omitted).  Notably, in implementing § 216(b), "district courts have discretion . . . ." *Hoffmann-La Roche Inc.*, 493 U.S. at 170.  And, this discretion is particularly "broad" with respect to the "details' of the notice sent to potential opt-in plaintiffs." *Butler*, 876 F. Supp. 2d at 574.

To facilitate notice to potential opt-in plaintiffs, Shaver seeks an "order [that] Defendants [ ] produce the names, dates of employment, e-mail addresses and last known mailing addresses of the collective members to facilitate notice to potential plaintiffs of this pending lawsuit."  ECF 22-1 at 15, Shaver Memo.  Plaintiff argues: "This [request] is routinely granted by the districts [sic] courts." *Id.*

I agree that in the context of a conditional collective, the production of names and some contact information for the potential opt-in plaintiffs is not an unusual request. *See*, *e.g.*, *Butler*, *supra*, 876 F. Supp. 2d at 575 n.17 ("To effectuate this notice, Defendants will be required to produce a file containing the full names and last known home and email addresses of potential opt-in plaintiffs . . . ."); *Williams*, *supra*, 585 F. Supp. 2d at 691 ("The Defendant is ordered to produce to the Plaintiffs the employment and wage records, containing names and last known addresses, for all of Defendant's employees, workers, or laborers of any status, from January 2006 to the present."); *Calder v. GGC-Baltimore, LLC*, No. BPG-12-2350, 2013 WL 3441178, at *3 (D. Md. July 8, 2013) ("So as to facilitate that notice, defendant is directed to supply plaintiffs with identifying information for the potential plaintiffs, to include full name, last known residential address, and last known e-mail address.").

Opposing Defendants have not indicated that they are unable to provide such information.  Therefore, they shall be required to produce the names, dates of employment, e-

mail addresses and last known mailing addresses of the potential collective members, as requested by plaintiff.

Turning to the language of the Proposed Notice, Opposing Defendants highlight several purported deficiencies. In particular, they insist that the Proposed Notice is faulty because it fails to disclose the defense position as to the lawsuit and to advise potential opt-in plaintiffs of their right to join the suit with their own attorney. Opposing Defendants also insist that the Notice fails to inform potential opt-in plaintiffs of their potential obligation to participate in the "discovery process and at trial[.]"  ECF 28 at 9, Opposition. Plaintiff has not responded to these concerns.

The Gill Defendants' concerns are legitimate. *See, e.g.*, *Butler*, 876 F. Supp. 2d at 575 n.17 (requiring defendant to amend a proposed notice to include a statement about defendants' position and to inform plaintiffs about the obligations of discovery and the availability of retaining one's own counsel); *Wass v. NPC Int'l, Inc.,* 09-2254-JWL, 2011 WL 1118774, at *10 (D. Kan. Mar. 28, 2011) (directing plaintiffs to amend the proposed notice to include, *inter alia*, a statement about the defendant's position); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F.Supp.2d 445, 450 (S.D.N.Y. 2011) (directing plaintiffs to amend the proposed notice to inform potential opt-in plaintiffs "of the possibility that they will be required to participate in discovery and testify at trial" and "to state that participating plaintiffs may retain their own counsel"). Accordingly, the Proposed Notice must be amended to correct these deficiencies.

Opposing Defendant's final request, and the only modification to the Proposed Notice that is contested, is whether defense counsel's contact information should be included in the Proposed Notice.

Judge Chasanow explained in *Arevalo v. D.J.'s Underground, Inc.*, DKC 09-3199, 2010 WL 2639888, at *3 (D. Md. June 29, 2010): "Courts around the country are split, with some supporting exclusion of defense counsel information . . . and some including defense counsel information . . . . Cases in this district have heretofore identified defense counsel, but not with full contact information and, occasionally, including cautionary language to putative plaintiffs." Likewise, in *Cedillos-Guevara v. Mayflower Textile Servs., Co.*, GLR-14-196, 2014 WL 7146968, at *4 (D. Md. Dec. 12, 2014), the court ordered the inclusion of defense counsel's contact information in the same way: "Plaintiffs must add contact information for Defendants' counsel to the amended notice, but limit it to counsel's name and address."

The approach in *Cedillos-Guevara* and *Arevalo* appears reasonable. Moreover, as noted, "[t]he district court has broad discretion regarding the 'details' of the notice sent to potential opt-in plaintiffs." *Mitchel v. Crosby Corp.,* DKC 10-2349, 2012 WL 4005535, at *7 (D. Md. Sept. 10, 2012) (citations omitted). And, as noted, pursuant to the "overarching policies" of the FLSA, the proposed notice should "provide 'accurate and timely notice concerning the pendency of the collective action, so that [potential plaintiffs] can make informed decisions about whether to participate.'" *Id.* (citations omitted).

The objectives of the FLSA are not undermined by accommodating Opposing Defendants' request.  *See also Flores*, *supra*, 2015 WL 1523018, at *5 ("'The district court has broad discretion regarding the 'details' of the notice sent to potential opt-in plaintiffs.'") (citations omitted).  Therefore, I will require inclusion in the Notice of defense counsel's names, telephone numbers, mailing addresses, and email addresses, corresponding to the information included in the Amended Complaint by and about counsel for plaintiffs.

### III.  CONCLUSION

For the foregoing reasons, plaintiff's Motion to Certify the Collective (ECF 22) is granted in part and denied in part.   Specifically, I shall grant the portion of the Motion seeking certification of the collective, dating from January 18, 2013, to the present, as to all hourly employees of the Gill Defendants.   But, the Notice must be revised to reflect Opposing Defendants' proposed changes.   Finally, the Gill defendants shall be required to produce the names, dates of employment, e-mail addresses, and last known mailing addresses of the potential collective members, as requested by plaintiff.

An Order follows.


Date: <u>October 6, 2015</u>                    _____/s/_____

                                       Ellen Lipton Hollander
                                       United States District Judge